IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOHN VIGIL,

Plaintiff,

vs. No. CIV 04-726 LFG/RHS

CITY OF ALBUQUERQUE, and
SANDRA DOYLE individually and
in her official capacity,

Defendants.

**MEMORANDUM OPINION AND ORDER**
**GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Defendants' Motion for Summary Judgment [Doc. 28], filed herein on June 20, 2005. Plaintiff filed his Response and Defendants their Reply. The motion is fully briefed and ready for ruling. No oral argument is necessary. For the reasons given below, the Motion for Summary Judgment is granted.

**Procedural Background**

Plaintiff John Vigil ("Vigil") brings this action against Defendants City of Albuquerque ("City") and Sandra Doyle ("Doyle"), Director of Finance and Administrative Services for the City of Albuquerque. Vigil, a Hispanic male, alleges that Defendants discriminated against him on the basis of gender and national origin by failing, on two separate occasions,[1] to promote him to the

[1]In their opening brief, Defendants argue for summary judgment as to Vigil's claim of retaliation in connection with a third occasion in the Fall of 2003, when Vigil was again passed over for promotion. However, in his Response to the motion and in his deposition, Vigil makes clear that he is not bringing any claim arising from the Fall 2003 occasion. [Memorandum in Opposition to Summary Judgment, Doc. 33, at 2-3; Vigil Deposition, Doc. 29, Ex. A, at 74-75].

position of Purchasing Officer and instead selecting other applicants who were less qualified. On the first occasion, in the Fall of 2002, the successful applicant was a non-Hispanic male; the second time, in Spring 2003, the job went to a non-Hispanic female. Vigil alleges that Defendants' failure to promote him was motivated by discriminatory animus in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the New Mexico Human Rights Act, N.M.S.A. § 28-1-1 *et seq.*; and furthermore constitutes breach of a contract of employment. The facts will be set forth in more detail below.

Defendants deny Plaintiff's allegations and bring this Motion for Summary Judgment, arguing that Defendant Doyle should be dismissed from the action entirely and contending that, in any event, there is no genuine issue of material fact as to the liability of either Defendant under any of the causes of action asserted by Plaintiff. The Court agrees that Plaintiff has not raised genuine issues of fact sufficient to get to a jury and therefore grants summary judgment in favor of Defendants.

**Standards for Summary Judgment**

Summary judgment is appropriate when the moving party can demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 90 S. Ct. 1598 (1970); Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co., 52 F.3d 1522, 1527 (10th Cir. 1995). The party moving for summary judgment has the initial burden of establishing, through admissible evidence in the form of depositions, answers to interrogatories, admissions, affidavits or documentary evidence, that there is an absence of evidence to support the opposing party's case and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986).

Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrate the presence of a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986); Biester v. Midwest Health Servs, Inc., 77 F.3d 1264, 1266 (10th Cir. 1996). The party opposing the motion may not rest upon the mere denials of his pleadings to avoid summary judgment, nor will mere argument or contention of counsel suffice. Fed. R. Civ. P. 56(e); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

"The mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine.'" Lawmaster v. Ward, 125 F.3d 1341, 1347 (10th Cir. 1997). Summary judgment can be entered only if there is insufficient evidence for a reasonable jury to return a verdict for the party opposing the motion. Anderson, 477 U.S. at 249, 106 S. Ct. at 2511. Thus, the Court's inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id., at 251-52, 106 S. Ct. at 2512.

## Discussion

The facts as described below are taken from Plaintiff's Affidavit [Doc. 34] and exhibits; Plaintiff's deposition [Doc. 29, Ex. A] and attachments; Defendant Doyle's Affidavit and Supplemental Affidavit [Doc. 20, Ex. B; Doc. 42, Ex. D], and attachments; and the Affidavit of Judy A. Montoya [Doc. 29, Ex. C] and attachment. They are construed, as they must be, in the light most favorable to the party opposing summary judgment. Foster v. Alliedsignal, Inc., 293 F.3d 1187 (10th Cir. 2002).

**A. Title VII Claim**

Vigil's claim under Title VII alleging race and gender discrimination in promotion is analyzed under the burden-shifting process of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). The focus of McDonnell Douglas was "the order and allocation of proof in a private, non-class action challenging employment discrimination." Id., 411 U.S. at 800.

Under this allocation of proof, in a failure-to-promote case, the plaintiff has the initial burden of establishing a prima facie case of national origin or gender discrimination by showing that: (1) he was a member of a protected class; (2) he applied for and was qualified for the position; (3) despite being qualified he was rejected; and (4) after he was rejected, the position was filled. Jones v. Barnhart, 349 F.3d 1260, 1266 (10th Cir. 2003).

If the plaintiff carries his burden and establishes a prima facie case, the burden shifts to the defendant to state a legitimate, nondiscriminatory reason for the applicant's rejection. McDonnell Douglas, *supra*, 411 U.S. at 802-04. At this stage, the defendant is required only to "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII." EEOC v. Flasher Co., 986 F.2d 1312, 1317 (10th Cir. 1992). In other words, the defendant must present evidence of a neutral, business-related reason for its employment decision.

If defendant carries that burden, the presumption raised by the prima facie case disappears, and the burden shifts back to the plaintiff to present evidence that the employer's stated reason was a pretext for a discriminatory motive. McDonnell Douglas, *supra*, 411 U.S. at 802-04; Jones v. Barnhart, *supra*, at 1266. The plaintiff need not present direct evidence of discriminatory intent in order to fulfill the "pretext" requirement; it is sufficient for the plaintiff to present indirect evidence of discrimination by showing that "an employer's proffered explanation is unworthy of credence."

Randle v. City of Aurora, 69 F.3d 441, 452 (10th Cir. 1995).

"[T]he three-part McDonnell Douglas burden-shifting analysis is limited to the summary judgment context. Once there has been a full trial on the merits, the sequential analytical model adopted from McDonnell Douglas drops out." [Internal punctuation omitted]. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220 (10th Cir. 2000). To escape summary judgment under the McDonnell Douglas analysis, a plaintiff must demonstrate both the elements of a prima facie case and, "[i]f the defendant is able to articulate a valid reason, the plaintiff can avoid summary judgment only if she is able to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual." Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999).

The plaintiff's burden is, therefore, to make these two factual showings. Defendant's only burden is to articulate a nondiscriminatory reason for the failure to promote the plaintiff. Randle v. City of Aurora, *supra*, at 453 n.17; Perry v. Woodward, *supra*, at 1135 ("[w]hen the McDonnell Douglas analysis is utilized, the burden of production shifts from plaintiff to defendant and back to plaintiff . . . . The ultimate burden of proving discrimination, however, is borne by the plaintiff").

1. Prima Facie Case

Plaintiff alleges that the first time he applied for promotion to the position of Purchasing Officer, he was subject to discrimination based on his national origin, and a non-Hispanic male was chosen for the post. The second time, he alleges gender and national original discrimination, as a non-Hispanic female was chosen for the position. With regard to his claim of gender discrimination, the parties agree that the first element of the prima facie case – that Vigil was a member of a "protected group" – is modified when a male alleges gender discrimination:

> [T]he McDonnell Douglas prima facie case formulation must be

> modified when the plaintiff pursues a "reverse discrimination" claim . . . . As the Supreme Court has indicated, a prima facie case under McDonnell Douglas raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on consideration of impermissible factors . . . . [Therefore] it is appropriate to adjust the prima facie case to reflect the reverse discrimination context of a lawsuit because the presumptions in Title VII analysis that are valid when a plaintiff belongs to a disfavored group are not necessarily justified when the plaintiff is a member of an historically favored group. [Internal punctuation omitted].

Notari v. Denver Water Dept., 971 F.2d 585 (10th Cir. 1992).

Thus, the Tenth Circuit holds that a Title VII disparate treatment plaintiff who pursues a reverse discrimination claim must, "in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." Id., at 589; *Accord*, Mattioda v. White, 323 F.3d 1288, 1293 (10th Cir. 2003). Therefore, under Notari, Vigil's prima facie case showing must include evidence which at least raises a genuine issue of fact that the City is "one of those unusual employers" who discriminates against males.

In attempting to shoulder this burden, Vigil states that Defendant Doyle, the hiring official, is female; that Vigil had more years of purchasing experience overall than did Deena Noonan ("Noonan"), the person chosen for the job; and that Vigil had materials management experience while Noonan did not. [Doc. 33, at 14-15]. This showing is inadequate to permit the Court to conclude that Plaintiff carried his requisite burden under Notari. As was true of the plaintiff's evidence in Silva v. Goodwill Indus. of N.M., Inc., 210 F.3d 390 (Table, test in Westlaw), 2000 WL 358437, at *2 (10th Cir. Apr. 7, 2000), Vigil's "evidence does not demonstrate a genuine issue of material fact as to background circumstances of discrimination." Indeed, Vigil presents no "background

circumstances" at all. The fact that the hiring official is female and that she hired a female applicant over a male does not prove that the City of Albuquerque is one of those unusual employers who generally discriminates against males. Notari v. Denver Water Dept.

Although the other three elements of the prima facie case are met – that is, Vigil has established that he applied for and was qualified for the position, that despite being qualified he was rejected, and that after he was rejected, the position was filled by another – nevertheless, Plaintiff has simply failed to meet his burden of proof on his claim of gender bias in a reverse discrimination case. Notari makes clear that a reverse discrimination claimant, who cannot show his employer is one of those unusual ones who discriminates against the majority, may still make out a Title VII claim by presenting direct proof of discriminatory intent, or indirect evidence sufficient to support a reasonable probability that but for the plaintiff's status as a male he would have been promoted. But, as discussed below, Vigil has not presented evidence sufficient to get to the jury on this issue.

However, because Vigil brings a claim of national origin discrimination in addition to asserting gender discrimination, the Court will therefore proceed with the full McDonnell Douglas analysis. Under that analysis, even if Vigil had stated a prima facie case with regard to the gender discrimination claim, the Court finds that Defendants carried their burden of showing a legitimate nondiscriminatory reason for denying Vigil both promotions, and that Vigil has not come forth with evidence of pretext sufficient to raise an issue for jury determination. Summary judgment in favor of Defendants on the Title VII claim is therefore appropriate.

2. Defendant Has Shown Legitimate, Nondiscriminatory Reasons for Rejecting Vigil's Application for Promotion Both in 2002 and in 2003

Assuming Vigil has established a prima facie case of discrimination in promotion, the burden

then shifts to Defendant City of Albuquerque[2] to show a legitimate, nondiscriminatory reason for its employment action.

At this stage of the McDonnell Douglas analysis, the employer is required only to "explain its actions against the plaintiff in terms that are not facially prohibited by Title VII. EEOC v. Flasher Co., Inc., *supra*, at 1317. Indeed, the [employer] satisfies this step by asserting non-discriminatory reasons for hiring the successful applicants rather than [the plaintiff]." Jones v. Barnhart, *supra*, at 1266. The Court finds that the City has met this burden by demonstrating that its reason for preferring the other applicants over Vigil was because, both times, the other applicants had better qualifications for the position.

a. The 2002 Application for Promotion

In June 2002, the City of Albuquerque advertised the position of Purchasing Officer. Vigil applied for the position, which would have been a promotion for him. At the time, he had been employed by the City as Internal Services Supervisor, at the M-16 level, for nine to ten years. Prior to his position as Internal Services Supervisor, Vigil was a senior buyer for six years, during which time, he did purchasing for the City Warehouse. Prior to that, he was a warehouseman for two years, driving, loading trucks, filling orders, and sitting on committees.

The Internal Services Section is part of the Purchasing Division for the City. It provides materials management in addition to its procurement and purchasing functions. Vigil's duties as

[2]The parties are in agreement that Vigil's claims under Title VII are applicable only to Defendant City of Albuquerque, as Defendant Doyle is not a proper defendant in a Title VII claim in her individual capacity, and a suit against her in her official capacity is the equivalent of suit against the City itself. Haynes v. Williams, 88 F.3d 898, 901 (10th Cir. 1996); Sauers v. Salt Lake County, 1 F.3d 1122, 1125 (10th Cir. 1993); Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105 (1985). *See*, Plaintiff's Response, Doc. 32, at 1 ("Plaintiff does not purport to bring claims against Defendant Doyle individually for either violations of Title VII or for breach of contract").

Internal Services Supervisor included managing the City Warehouse; managing the Office Services Section which included printing, copying, and mail services; acquisition of bids and services for supply distribution; budgeting for the Internal Services Fund; and responsibility for surplus and salvage. He also had administrative responsibilities, including hiring and discipline, and developing and implementing policies and procedures for the Internal Services section.

Vigil was responsible for approximately $1 million of budget for the City Warehouse and Office Services.. The inventory in the warehouse was approximately $1.5 million. Vigil notes that, in addition to the $1.5 million in standing inventory, he was also responsible for approximately $5 million in procurement contracts, including printing and copying contracts and, he asserts, all rolling stock such as forklifts, vehicles, equipment, fixtures and facilities.

On occasion, in the absence of the Purchasing Officer, Vigil also served as Acting Purchasing Officer. When assigned to act as Acting Purchasing Officer, Vigil was given a "Delegation of Signature Authority" which granted him full operational control of the Purchasing Division.

The Offices Services component of Vigil's job was located at City Hall, but the majority of his time was spent at the Pino Yards warehouse, a site far removed from City Hall. The management of Office Services accounted for approximately 20% of his assigned duties. He went to City Hall one time a week for an Office Services meeting which lasted for less than an hour, and he also spent other time at City Hall in connection with his Office Services duties, to train and help implement new programs or processes. On one occasion, for example, he used the Microsoft Access program to set up a new system for managing requisitions and soliciting quotes from vendors.

Vigil holds a bachelor's degree in University Studies with an emphasis in economics. He stated in his application for the position of Purchasing Officer that he was studying and testing for

certification as a Certified Purchasing Manager ("CPM"); however, he acknowledged in his deposition that he had taken no steps to complete the certification other than submit a registration form in 2001 and obtain a CPM Certification Study Manual.

Vigil was not chosen for the Purchasing Officer position in 2002. Instead, the City hired Bharat Parikh ("Parikh") for the position. Parikh is not Hispanic. Vigil contends that he was better qualified than Parikh, and the City's selection of Parikh was motivated by discrimination against Vigil based on national origin.

As evidence that he was better qualified, Vigil points to the fact that he had governmental experience, and experience within the City system, whereas Parikh did not. However, he acknowledges that government experience was not a stated qualification for the position, and he conceded in his deposition that the City could reasonably have wanted to hire someone from outside of government to bring in fresh ideas.

As further evidence that he was better qualified, Vigil also cites Parikh's history of moving frequently from job to job. Parikh's job application indicates that, at the time he applied for the Purchasing Officer position in 2002, Parikh held his most recent job for six years. He held the job prior to that for 2 ½ years; the one prior to that for 6 months; then 1 ½ years, 2 years, and 9.5 years. While this job history is not as stable as Vigil's, Doyle states in her affidavit that Bharat Parikh had an MBA in purchasing and a CPM certification, which was a preferred qualification according to the job description. She states generally that Parikh was hired "because of his superior qualifications in central purchasing functions and his education." [Doc. 29, Ex. B, at ¶ 5].

Vigil does not dispute that Parikh holds an MBA while Vigil does not. Nor does Vigil have the CPM certification which was a listed qualification preference and, according to his deposition

testimony, he has taken no steps to achieve the certification aside from registering for the test and ordering a study manual. Vigil states at one point in his deposition that Parikh did have a CPM at the time of the application [Doc. 29, Ex. A, at 77]; but he then contradicts himself by stating later that he thought Parikh had not completed his CPM certification at the time he applied for the position. [Doc. 29, Ex. A, at 81-82]. However, he could cite no documentary support for this latter statement other than to say he thought "it was from some of the documents that were submitted to us from the City, but I have to go back and review those." [Doc. 29, Ex. A, at 81-82].

Vigil did not provide any such documentation in connection with his Response to the summary judgment motion, and it apparent that he was mistaken in this statement. In its Reply, Defendant supplied a page from Parikh's job application in which he supports Doyle's assertion that Parikh held the CPM certification at the time he applied for the Purchasing Officer position. Vigil has provided nothing to negate this showing other than the tentative statement from his deposition, and Vigil's unsupported and contradictory statement does not suffice to raise a triable issue as to Parikh's certification.

The Court finds that Defendant met its burden of showing a legitimate, nondiscriminatory reason for hiring Parikh instead of Vigil in 2002. Doyle states that Parikh was hired because he had superior qualifications and education, and the record clearly supports this assertion. Parikh's application indicates that he had substantial purchasing experience at the management level in the private sector and worked extensively with automated purchasing systems. Parikh earned a bachelor of science degree in Bombay, India, then went on to earn his MBA at the University of Dallas. Vigil had a bachelor's degree, but unlike Parikh he did not have a master's degree. Parikh was certified with a CPM, while Vigil was not; this was a preferred qualification for the position. [Doc. 29, Ex.

C, Affidavit of Judy A. Montoya and attachment thereto]. Parikh's experience was in the private sector, whereas Vigil's was in government; however, governmental experience was not a listed, preferred qualification for the position. [Id.].

Defendant has explained its preference for Parikh in the 2002 hiring "in terms that are not facially prohibited by Title VII"; Defendant has presented a legitimate business-related explanation for its employment decision.

Defendant having met its burden under McDonnell Douglas, the burden shifts to Plaintiff to demonstrate by admissible evidence that the City's explanation is pretextual and not worthy of belief. Plaintiff fails to carry his burden of persuasion.

b. The 2003 Application for Promotion

Parikh did not remain long in the Purchasing Officer job. Doyle states in her Affidavit that he "did not work out and left his employment in February, 2003," and the position was advertised again. Again Vigil submitted an application for promotion to the position. Another in-house candidate, Noonan, also applied for the job and was ultimately chosen to be the new Purchasing Officer.

Vigil alleges that the City's selection of Noonan was based on factors outlawed by Title VII: *i.e.*, race and national origin. He contends that he was the better qualified candidate and that Defendants did not hire him because he is male and Hispanic, rather than because Noonan had better qualifications. As noted above, at this stage Defendants are required only to explain their actions in terms that are not facially prohibited by Title VII. EEOC v. Flasher Co., Inc., *supra*, at 1317. The Court finds that Defendants have met this burden.

Doyle states in her affidavit that both Noonan and Vigil were deemed qualified by the City's

Human Resources Department. She believed that Vigil was "minimally, but not the best, qualified for the position because he had no central purchasing experience." [Doc. 29, Ex. B, at ¶ 7]. Doyle states further that, prior to the time the position was re-posted, she worked with Noonan in the Public Works Department and was aware of Noonan's abilities. She said that both Noonan and Vigil were made Acting Purchasing Officer for several days at a time in the absence of the Purchasing Officer, that both served in this position for approximately the same number of days. When Noonan served as Acting Purchasing Officer, Doyle states, Noonan herself performed all of the assigned duties; whereas when Vigil served as Acting Purchasing Officer, he remained at the warehouse and delegated many of the required Purchasing Officer duties to Noonan.

As further reasons why Noonan was selected for the position in 2003, Doyle states that Noonan was involved in central purchasing functions for approximately 12 ½ years and participated in purchasing operations while assigned to the Public Works Department. Noonan handled large accounts, including one for which she developed and managed a new contracting process. Noonan developed a complex formula used in the selection process for engineering equipment purchases, and also modified the City's computer program to satisfy purchasing needs.

Doyle also notes that Vigil's experience, while extensive, consisted primarily of inventory purchasing, which is "substantially different" from the central purchasing functions that Noonan was carrying out. Doyle continues:

> Central purchasing involves the decision making process of how to purchase in response to a purchase request. Decisions must be made as to whether a request for proposal, bid or sole source proceeding is the best method for acquiring what is being requested. The Purchasing Officer interacts with the city attorney to ensure that legal decisions are being made. The warehouse inventory function is one small piece of the purchasing process. Warehouse purchasing requires

> primarily ordering supplies, includes making procurement decisions on a very limited basis, and involves no or only minimal interaction with the legal process.

[Doc. 29, Ex. B, at ¶ 14]. Doyle points out that Vigil's experience was in procuring warehouse supplies and that, in contrast to Noonan, he had not demonstrated an ability to engage in the decision making processes necessary for the central purchasing function.

In addition, Doyle stated, the Purchasing Office is involved in the political process at City Hall, and the Purchasing Officer position requires political skills. She said that Noonan attended City Council meetings routinely and was well known to City Councilors and others at City Hall. Noonan was available to assist Doyle when needed, because of her proximity and willingness to provide assistance. Meanwhile, Vigil remained for the most part at the warehouse, where he was not immediately available for assignments when needed, did not offer assistance during periods when the Purchasing Officer position was vacant, and had no involvement in the political process. When encouraged to relocate to a downtown office so as to enhance his presence in City government and build employment contacts, Vigil declined.

Doyle states in her supplemental affidavit that she considered the description of Vigil's job duties, as described in his application for promotion, and compared them with those described in Noonan's application. At the time of the applications, Noonan was responsible for all aspects of budgeting for the Public Works Department, which has a substantially larger budget than the warehouse budget which Vigil oversaw. Noonan was also responsible for oversight and review of purchasing functions for compliance with City Purchasing regulations, and she performed each of the tasks and responsibilities performed by the Central Purchasing Program as specified in the City's approved budget. Noonan also performed materials management while at the Water Department (the

predecessor to the Public Works Department), when she was responsible for purchasing materials such as water meters.

Doyle concludes in her affidavit that she believes Noonan was the best qualified applicant for the Purchasing Officer position in the Spring of 2003, regardless of her national origin and gender. The Court finds that Defendants have adequately explained the City's preference for Noonan in the 2003 hiring "in terms that are not facially prohibited by Title VII," and it has therefore met its burden at this step. The analysis now shifts to a discussion of pretext, wherein Vigil assumes the burden of demonstrating that the proffered reasons are a pretext for discriminatory motives.

3. Plaintiff Has Not Shown that Defendants' Stated Reasons Are a Pretext for Discrimination

At this point in the McDonnell Douglas scheme, Vigil has the opportunity to show that Defendant's stated reasons for rejecting his application for promotion in 2002 were in fact pretext for a discriminatory motive. The Tenth Circuit holds that as long as the plaintiff presents evidence of pretext upon which a jury could infer a discriminatory motive, the case should go to trial, as "judgments about intent are best left for trial and are within the province of the jury." Randle v. City of Aurora, *supra*, at 453. On the other hand, the plaintiff cannot meet his burden by simply alleging that the facially nondiscriminatory reason was pretextual. Admissible evidence supporting that conclusion must be tendered. Speculation is not sufficient to make out a case for the jury. Ingels v. Thiokol Corp., 42 F.3d 616, 620 (10th Cir. 1994).

> Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. Mere conjecture that the employer's explanation is a pretext for

> intentional discrimination is an insufficient basis for denial of summary judgment. [Internal punctuation and quotation marks omitted].

Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997), *quoting* Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988).

The deciding issue is whether the plaintiff has offered sufficient evidence that a reasonable jury could find that defendant intentionally discriminated against him. Durham v. Xerox Corp., 18 F.3d 836, 839 (10th Cir. 1994).

> [A]fter the defendant has carried its burden of production by offering a legitimate, non-discriminatory reason for its action, the presumption of discriminatory motive simply drops out of the picture . . . . Thus, at the third stage of the McDonnell Douglas analysis, a discrimination case looks like any other civil case where the plaintiff at all times bears the ultimate burden of persuasion . . . . [E]ven though a plaintiff has established a prima facie case, the defendant is entitled to summary judgment unless the plaintiff produces either direct evidence of discrimination or evidence that the defendant's proffered reason for the action taken was pretextual. [Internal punctuation omitted].

Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1396-97 (10th Cir. 1997).

Plaintiff may make such a showing by pointing to facts which indicate that the defendant's stated reasons are not worthy of belief, Anderson v. Coors Brewing Co., 181 F.3d 1171, 1180 (10th Cir. 1999), and that the true motive for the employment decision is one prohibited by Title VII.

> We emphasize that the plaintiff in a Title VII case must prove that *intent* to discriminate *based upon* plaintiff's protected class characteristics was the determining factor for the allegedly illegal employment decision . . . . [Even] evidence that the articulated legitimate business reason for the decision was pretextual does not compel the conclusion that the employer intentionally discriminated . . . [because] although pretext is shown, motivation for [the] employer's decision may have been favoritism, revenge, or random or erroneous conduct or judgment, none of which are prohibited by Title VII . . . . Title VII is not violated by the exercise of erroneous or even illogical business judgment . . . . [W]e are not in the business of

> determining whether an employer acted prudently or imprudently in its hiring decisions.

Sanchez v. Philip Morris, Inc., 992 F.2d 244, 246-48 (10th Cir. 1993).

It is generally true that, in examining claims of pretext, a court will not second-guess the employer's judgment as to who is better qualified. The plaintiff's feeling that he was equally or more qualified than his rival will not, standing alone, support a finding of pretext. "It is the perception of the decision maker which is relevant, not plaintiff's perception of [him]self." Branson v. Price River Coal Co., *supra*, at 772.

a. The 2002 Application for Promotion

Vigil has not presented any direct evidence that Defendants' actions in 2002 were taken with discriminatory intent. He presents no comments or statements from anyone in a supervisory position that indicate a negative attitude toward applicants or employees because of their national origin or gender. He does not present statistical or other evidence of any other Hispanic or male applicants for promotion or hiring who were passed over because of their national origin or gender. He states in his affidavit that "all promotions of Hispanics by Sandy Doyle occurred after the filing of Plaintiff's lawsuit" [Doc. 34, at ¶ 18], but he provides no documentary evidence to support this assertion.

Indeed, at his deposition, Vigil was asked what evidence he had to support his belief that the failure to promote him in 2002 was based on national origin discrimination. He answered:

> A. I didn't get the job.
> Q. Anything else?
> A. That's all.
> Q. Did anybody ever make any comment to you that this had anything to do with your national origin?
> A. No.
> Q. Did you ever ask anybody if it had anything to do with your national origin?

A. No.
Q. So other than the fact that somebody other than you was selected, you think it's because of your national origin?
A. Well, I was Hispanic, and he wasn't.
Q. Right. And that's the only reason you're making the claim?
A. Uh-huh.
Q. Yes?
A. Yes.

***

Q. And the only reason you have to say that that was discriminating against you in your national origin is because you didn't get the job?
A. And I was well qualified.

[Doc. 29, Ex. A, at 83-84].

Failing to show direct evidence of discrimination, a Title VII plaintiff may still meet his burden of proving intentional discrimination indirectly at step three of the McDonnell Douglas analysis, and get to the jury, by presenting evidence to show that he was actually more qualified than those who were promoted. Durham v. Xerox Corp., *supra*, at 839-40:

> Durham also tries to prove intentional discrimination indirectly by showing that she was more qualified than those promoted to the controller job . . . . [P]roof that Durham was more qualified would disprove Xerox's only explanation for its actions, that Durham was less qualified than the successful candidates. Although a prima facie case combined with disproof of the employer's explanations does not prove intentional discrimination as a matter of law, it may permit the factfinder to infer intentional discrimination, and thus preclude summary judgment for the employer.

In this case, however, the Court finds that Vigil has not made such a showing, either in the 2002 hiring of Parikh, or in the 2003 promotion of Noonan.

As noted above, Parikh earned an MBA degree and also held the CPM certificate, whereas Vigil had neither of these credentials. It is true, as Vigil points out, that his purchasing experience was in government, whereas Parikh's was all in the private sector; however, government experience

was not one of the listed job criteria, and Vigil acknowledged that the City could reasonably have preferred someone from outside, for a fresh perspective. Parikh's application displayed significant high level experience in purchasing for large corporations, whereas Vigil's purchasing experience comes in warehouse inventory purchasing. Vigil argues that his job history is more stable than Parikh's. While this may be true, it does not override the other, substantial evidence of Parikh's qualifications for the position in comparison with Vigil's.

Defendants do not contend that Vigil was unqualified for the position; indeed, twice he made the cut as a "qualified" applicant who advanced to the interview stage. But, the City states, it found Parikh more qualified than Vigil in the 2002 application process, and Vigil has not presented evidence of his superior qualifications sufficient to raise an issue of fact as to pretext as to the 2002 application.

b. The 2003 Application for Promotion

As was true with the Parikh hiring, Vigil has not presented any direct evidence of discriminatory motive on the part of Defendants in connection with the 2003 application. The Court finds, in addition, that Vigil has not met his burden of demonstrating pretext by showing that he was more qualified for promotion than was Noonan, the person chosen in the Spring of 2003.

A side-by-side comparison of Vigil's and Noonan's applications reveals the following data. Both Vigil and Noonan had the same level of education; *i.e.*, a bachelor's degree in University Studies from the University of New Mexico. At the time they applied for the Purchasing Officer position in March/April 2003, both were serving as Internal Services Supervisors at the M-16 level in the Finance and Administrative Services Department, Purchasing Division. Noonan had been working at this position for 1 year, 10 months at the time of her application; Vigil for 7 years, 10 months.

The job announcement for the position, as circulated in the Spring of 2003, provided the

following "General Statement of Duties" for the posted vacancy:

> To plan, direct, manage and oversee the activities and operations of the central purchasing office of the Department of Finance and Administrative Services including purchasing, warehousing and office services activities; to coordinate assigned activities with other divisions, departments and outside agencies; and to provide highly responsible and complex administrative support to the Finance Director.

[Doc. 29, Ex. A., Attachment 7 thereto].

Applicants for the 2003 position were required to have, at a minimum, a bachelor's degree with major course work in business administration, public administration or a related field, plus "eight (8) years of central purchasing and materials management experience to include five (5) years in a direct supervisory and/or administrative capacity." The CPM certificate is not required, although it is listed as a preferred qualification. [Id.].

Vigil's contention that he was better qualified than Noonan is based in part on his interpretation of the syntax of the requirement that applicants have "eight (8) years of central purchasing and materials management experience." He contends that this language means the applicant is required to have eight years of central purchasing experience, plus eight additional years of materials management experience. Under this interpretation, Vigil argues, Noonan was not minimally qualified for the position, as she did not have the necessary eight plus eight years.

When the interpretation of contractual language is at issue, "the words used in the contract are afforded the plain meaning that a reasonable person would give to them . . . . 'Common sense and good faith are leading precepts of contract construction.'" Samson Resources Co. v. Abraxas Wamsutter LP, 117 Fed. Appx. 641, 644 (10th Cir. Nov. 3, 2004); Brown v. American Bank of Commerce, 79 N.M. 222, 225, 441 P.2d 751, 754 (1968) (in construing a contract, reasonable rather

than unreasonable interpretations are favored by the law).

An ordinary person reading the sentence quoted above would conclude that the requirement was for eight years of experience in central management and/or materials management for, if the City had intended an eight plus eight year requirement, they could have said so explicitly by using language such as, "eight (8) years of central purchasing experience, plus eight (8) years of materials management experience." Vigil's interpretation is less logical, less simple, and more convoluted than the one the City says it intended and applied.

In any event, Judy A. Montoya, the City Human Resources Manager, in her affidavit, states that the City in fact interpreted this statement "to require a total of eight years of experience in central purchasing and materials management. Eight years of experience in central purchasing and an additional eight years of experience in materials management was not required." [Doc. 29, Ex. C, at ¶ 9]. Montoya says that this interpretation was applied to all applicants equally. She states further that if Vigil's interpretation were followed, he would not have been deemed minimally qualified, as he does not have eight years of experience in central purchasing.[3]

Be that as it may, the fact that Vigil may have read this sentence differently than the City intended does not raise an issue of fact as to pretext nor demonstrate that Vigil was better qualified for the position, in the face of sworn testimony that the City interpreted the phrase in what can only be described as a logical manner, and that they consistently applied this interpretation to all candidates equally, including Vigil and Noonan.

[3]Vigil disputes this conclusion, arguing that his experience was indeed in central purchasing. The Court finds the dispute immaterial, however, as Vigil had not presented any evidence to refute the City's showing that it interpreted the job description language as not requiring the separate eight-year terms of experience, and that it applied this requirement to all candidates equally.

In addition to the minimum requirements, the job posting announces a preference for candidates with knowledge, skills and abilities in the areas of comprehensive purchasing and central stores programs including purchasing procedures, negotiating techniques, and cost benefit analysis; materials, supplies and equipment typically used in municipalities and the source for such products; principles of governmental purchasing and contract administration; relevant federal and state laws and regulations; experience in hiring and training staff; analyzing and evaluation purchasing methods and procedures; implementation of purchasing plans and policies for the City; and the ability to communicate clearly and concisely orally and in writing.

Unlike the job announcement posted for the 2002 vacancy when Parikh was hired, this time around the City explicitly listed a preference for candidates with experience in governmental and municipal purchasing. This factor does not favor the candidacy of either Noonan or Vigil, however, since both had extensive governmental and municipal purchasing experience.

Vigil also contends, in arguing that he was generally a better candidate than Noonan, that her management experience was inferior to his, because although she was responsible for direct supervision of five employees, she nevertheless had no responsibility for a budget or for management of financial assets, whereas he did. Vigil does not cite any record support for his statement that Noonan had no financial responsibilities, and Doyle, who was Noonan's supervisor, states in her affidavit that Noonan did in fact have responsibility for all aspects of budgeting for the Public Works Department in the amount of $95 million, and that Noonan listed this experience in her application for the Purchasing Officer position. Vigil's unsupported statement that Noonan had no budget or financial responsibility does not raise an issue of fact.

Vigil states that he was responsible for $1.5 million in standing inventory at the warehouse

and says that he also was responsible for an additional $5 million in procurement contracts for such things as printing and copying, rolling stock such as vehicles and forklifts, plus all equipment, fixtures and facilities for "the Department" (presumably, the Finance & Administrative Services Department, which is where he was employed at the time he filed his application). [Doc. 34, at ¶ 4]. Doyle agrees that Vigil was responsible for procurement contracts for printing and copying, but she states that he performed no duties with respect to rolling stock, or fixtures and facilities during her tenure as department director (*i.e.*, since December 2001).

This minor dispute does not create a material issue of fact, as the Court agrees with Defendant that "[t]he volume of the purchases is not relevant. What is important is the functions being performed." [Doc. 42, at 5].

Defendants contend that while Vigil had many years of experience in "inventory purchasing," Noonan had more experience in "central purchasing," and this helped make her the better-qualified candidate, as the position as Purchasing Officer for the City requires skills acquired in performing central purchasing functions. Vigil maintains that at the time of the application, he did indeed have more experience in central purchasing than did Noonan.

An examination of the record indicates that Vigil has not raised a genuine issue of material fact on the question of which candidate had better qualifications in the functions of central purchasing. It is clear as a matter of law that Noonan topped Vigil in this regard.

Vigil stated in his deposition that in his work as Internal Services Supervisor, he was stationed in the Pino Yard at the City Warehouse. His job entailed acquisition and management of bids and services for supply distribution for the City; budgeting for an Internal Services Fund, managing a fund for the Office Services section that covered printing, copying, mail services and distribution; and

managing surplus and salvage for the City. Vigil's experience is primarily in materials management and inventory management for the warehouse, with approximately twenty percent of his time spent in Office Services functions.

Noonan, on the other hand, engaged in numerous central purchasing functions, including evaluating purchase requests from City departments, approving exempt purchases, and preparing responses to bid protests for legal review. She also prepared operational budgets for the Public Works Department, the largest department in the City. As Defendant points out, Noonan's job duties as listed in her application include most of the functions specified in City ordinances as duties delegated to the Central Purchasing Office. While some of Vigil's job duties, as listed in his application, are also central purchasing functions, Noonan's experience is clearly more extensive with regard to these functions. Vigil has the burden at this stage of demonstrating his superior qualifications, and he has failed to meet that burden with respect to his relative experience at central purchasing functions vis à vis Noonan's.

In addition, Doyle points out that Noonan worked directly under her at City Hall prior to the time she applied for promotion and that Noonan was always available and willing to provide assistance when called upon. It is undisputed that Vigil, who spent at least 80 percent of his time at the City Warehouse, was less available than Noonan in this regard and did not step in as often nor as readily as did Noonan. Defendant argues that Doyle was justified in taking into consideration Noonan's availability and willingness to help, and that such consideration is not improper and does not, standing alone, constitute discrimination. The Court agrees. Even if this were considered to be cronyism, which the Court does not find, that would not make it discrimination. Neal v. Roche, 349 F.3d 1246, 1251-52 (10th Cir. 2003) ("'Title VII does not outlaw cronyism' . . . . [Indeed],

employers are free to employ nondiscriminatory criteria that are 'unfair' or even reprehensible, so long as they are not discriminatory").

The parties are also in some disagreement which, the Court finds, does not rise to the level of a genuine issue of fact, as to which candidate spent more and better time filling in as acting Purchasing Officer prior to the time the two applied for promotion to the position. There is no dispute that both Vigil and Noonan stepped in as Acting Purchasing Officer on occasion, as needed. Doyle states that Vigil and Noonan each spent an equal amount of time in the acting position, and neither received any additional compensation for this service.

In support of his argument that he was better qualified, Vigil points to the fact that Noonan's application shows that she was not assigned as acting Purchasing Officer but rather as acting *Assistant* Purchasing Officer. Noonan's application does note that she served as Acting *Assistant* Purchasing Officer in the absence of the *Assistant* Purchasing Officer. However, Doyle states in her affidavit that both Vigil and Noonan were made Acting Purchasing Officer for several days at various times, in the absence of the Purchasing Officer, and in his deposition, Vigil states that he believes that he himself was also appointed Acting Assistant Purchasing Officer.

This terminology is confusing, and whether or not Vigil and Doyle were "Acting Purchasing Officers" or "Acting Assistant Purchasing Officers" is not material to the issue of comparative qualifications. They both served in this position and, according to Doyle's affidavit, Vigil often delegated his "Acting" duties to Noonan, since she was located at City Hall and he was out at the warehouse. Vigil does not deny this. In addition, Doyle states that Noonan was always willing and available to perform the duties of the Purchasing Officer when called upon to do so. Without weighing the evidence, it is apparent to the Court that, in the comparative qualifications analysis, this

factor is a wash as between the two candidates or, if it falls either way, it favors Noonan's application.

In further support of his claims that he was better qualified, Plaintiff also presents the affidavit of Trinidad Morra, dated February 10, 2004, which was apparently part of the record of the administrative proceedings in connection with Vigil's EEOC claim. [Doc. 34, Ex.9]. As Purchasing Officer, Morra was Vigil's immediate supervisor from 1985 to 1998. Morra states that Vigil is "highly qualified" to hold the position as Purchasing Officer and that Vigil performed his duties as Acting Purchasing Officer "competently." These statements do not tend to show that the City discriminated against Vigil on the basis of national origin. *See,* Fallis v. Kerr-McGee Corp., 944 F.2d 743, 747 (10th Cir. 1991):

> [P]laintiff asserts that . . . he was a better qualified geologist than the younger geologists retained . . . . In support of these arguments, plaintiff relies on his own testimony regarding his work and the conclusory testimony of other geologists at Kerr-McGee who considered plaintiff a good performer. The trouble with these arguments is that they are merely general disagreement with Kerr-McGee's evaluation of which geologists were best able to guide the company through a difficult economic time. Under the law of this circuit, even if the jury chose to believe plaintiff's assessment of his performance rather than Kerr-McGee's, that choice, standing alone, does not permit a conclusion that Kerr-McGee's version was a pretext for age discrimination.

Aside from arguing that he was objectively better qualified, Vigil also asserts that the interview process was unfairly tilted to his disadvantage. He contends that the City changed the interview questions between his 2002 interview and the one in 2003 in a way that favored Noonan's application. The City counters that it naturally makes sense to change the interview questions in this situation, so that applicants who previously applied won't have an unfair advantage.

Vigil argues that this is "another way of saying that the questions were change [sic] to give

a disadvantage to Plaintiff who had interviewed before." [Doc. 33, at 17]. Whether or not this is true, it is not the sort of disadvantage that is prohibited to Title VII. Defendant is not obligated to give Vigil any special advantages, only a fair and level playing field. Any change in the interview questions would have affected not only Vigil, but any other candidate who had also applied for the 2002 vacancy; he does not contend and the record does not indicate that Vigil was the only candidate who applied both times. In addition, the 2003 job description for the Purchasing Officer position indicates that the preferred qualifications for the post changed between the 2002 and the 2003 vacancies, so it stands to reason that the 2003 candidates would be asked different questions.

Vigil specifically points to certain questions he says were eliminated which would, if they had been retained, have highlighted Noonan's lack of materials management experience, "a minimum qualification for the position." [Doc. 33, at 17]. But, as noted above, the City did not interpret the job description language in the same way that Vigil did and did not require eight separate years of materials management experience as a "minimum qualification." This change in interview questions does not show either a discriminatory motive, or a lack thereof. It is not material to the case.

Similarly, Vigil claims that the City's failure to provide a second round of interviews is further evidence that they were biased against him based on his national origin and/or gender. He argues, "by eliminated [sic] a second round of interviews usually performed, the employer has eliminated an opportunity to correct the problem caused by the initial screeners and interviewers failing to catch the problem." [Doc. 33, at 17]. Aside from the fact that it is unclear what "problem" he is referring to, other than a generalized allegation that the interviewers were biased, it is apparent that the lack of a second round of interviews affected all candidates equally, male and female, of whatever racial background or national origin. Vigil fails to demonstrate how this change in the interview process

demonstrates a bias on the part of Defendants.

After a close consideration of the record and the parties' respective positions, the Court finds that Vigil failed to sustain his burden of showing that he was a better qualified candidate than Noonan, and otherwise failed to demonstrate evidence of discriminatory intent sufficient to get to the jury. Summary judgment is therefore appropriate on his Title VII claim.

**B. New Mexico Human Rights Act Claim**

Plaintiff's claim under the NMHRA is analyzed with reference to the McDonnell-Douglas burden-shifting scheme. Smith v. FDC Corp., 109 N.M. 514, 517, 787 P.2d 433, 436 (1990).

The parties are in disagreement over whether the additional requirement of Notari v. Denver Water Dept., *supra*, applies in claims under the NMHRA. However, as was true with his Title VII claim, even assuming that Plaintiff has established a prima facie case, it is clear as a matter of law that Vigil was passed over for promotion on the basis of legitimate, nondiscriminatory reasons, and he has not raised a genuine issue of fact tending to show that these reasons were pretextual. Therefore, the Court need not reach the issue raised by Notari.

Similarly, the parties disagree as to whether Doyle is a proper defendant in an action under NMHRA. While individuals as distinct from employers can be sued under the NMHRA, Sonntag v. Shaw, 130 N.M. 238, 243, 22 P.3d 1188, 1193 (2001), that is of no consequence here, because the burden-shifting analysis of McDonnell Douglas compels the conclusion that, as a matter of law, neither Doyle nor the City is liable on Plaintiff's claims of violations of the NMHRA. Therefore, this claim, too, is subject to summary judgment.

**C. Breach of Contract**

The record is unclear as to whether Plaintiff intends to allege that Defendants, when they

failed to promote him, breached an implied, or an express, contract of employment. The complaint alleges an implied contract. [Complaint, Doc. 1, at ¶ 35]. The IPTR [Doc. 18] cites the City's Merit System Ordinance and the Personnel Rules and Regulations as the basis for Plaintiff's breach of contract claim. In his Response to the Motion for Summary Judgment, Plaintiff states that although he mis-titled Count II of his complaint as a claim for breach on an implied contract, he actually intends to bring a claim based on an "express employment contract arising out of the City's policies and procedures." [Doc. 32, at 2; *see also*, Doc. 33, at 19-22].

Plaintiff is not specific as to the exact portions of the City's Merit System Ordinance or the Personnel Rules and Regulations he relies upon to establish the contract of employment, and it is therefore unclear exactly what actions by Defendants allegedly constituted breach of contract. However, in his Complaint, Vigil asserts that his contract claim is based on the Defendants' having led him "to believe that he would be eligible for promotion based on merit and qualifications without reference to gender or national origin"; that he relied on the representations to that effect contained in the City's policies and procedures; and that "[b]y failing to promote Plaintiff in 2003, the City breached the said contract for employment by failing to provide benefits as agreed to with Vigil to promote on the basis of merit without reference to gender or National Origin." [Complaint, Doc. 1, at ¶¶ 33-36].

As discussed above, the Court finds, as a matter of law, that Defendants' employment actions with regard to Vigil were not based on discriminatory considerations of gender or national origin, but rather were taken for legitimate nondiscriminatory nonpretextual reasons – that is, on the basis of merit. Thus, under Vigil's definition of the terms of his employment contract, Defendants did not, as a matter of law, commit any breach thereof. Thus, the breach of contract claim is subject to

summary judgment whether or not Defendant Doyle is a proper defendant under this claim, whether or not the alleged contract was express or implied, and whether or not Vigil exhausted his administrative remedies, issues the Court does not find it necessary to reach.

Summary judgment being appropriate as to all of Plaintiff's claims, the case will be dismissed.

**Order**

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment [Doc. 32] is granted, and this case is dismissed with prejudice.

Lorenzo F. Garcia
Chief United States Magistrate Judge